53 Cal.App.4th 500 (1997)
CONTINENTAL HELLER CORPORATION, Cross-complainant and Respondent,
v.
AMTECH MECHANICAL SERVICES, INC., Cross-defendant and Appellant.
Docket No. B081741.
Court of Appeals of California, Second District, Division Seven.
February 18, 1997.
*502 COUNSEL
Toni Rae Bruno, Ronald A. Dwyer and Ann L. Mezzacappa for Cross-defendant and Appellant.
W. Frederick Kowalick for Cross-complainant and Respondent.
*503 OPINION
JOHNSON, J.
In this case, we hold an agreement by a subcontractor to indemnify a general contractor for loss "which arises out of or is in any way connected" with the subcontractor's "acts or omissions" in the performance of its work does not require a showing the subcontractor was at fault in causing the general contractor's loss or that its performance was a "substantial" or "predominating" cause of the loss. We also concur in the trial court's finding the subcontractor is liable to the contractor for its attorney fees in prosecuting this action to recover under the agreement.

FACTS AND PROCEEDINGS BELOW
In 1978, Oscar Meyer hired the Continental Heller Corporation (Continental) as its general contractor on a project to expand a meat packing plant. Continental subcontracted with the Ralph Manns Company for the installation of an ammonia refrigeration system in the expanded plant. While Manns was working on the refrigeration system, it was acquired by Amtech Mechanical Services, Inc. (Amtech), which assumed the assets and liabilities of Manns including the subcontract with Continental.
In 1989, an explosion occurred at the plant causing property damage and injuring several Oscar Meyer employees. The explosion was caused by the failure of a valve manufactured by the Wolfe-Linde Company and installed by Amtech in the course of its work on the refrigeration system.
Numerous complaints and cross-complaints followed the explosion. Continental tendered defense of the claims against it to Amtech pursuant to an indemnity agreement contained in the subcontract. Amtech declined to accept the tender of defense. Continental then settled the claims against it for $20,000 and brought this action against Amtech for contractual indemnity seeking to recover the $20,000 settlement plus its costs and attorney fees in defending the claims against it and in prosecuting this action.
Based on the language of the indemnity agreement, which we discuss in detail below, the trial court concluded Continental was entitled to the full recovery it sought from Amtech. The court specifically found Amtech was not negligent in installing the valve and Amtech did not "proximately cause" the leak and subsequent explosion. However, the court concluded, under the indemnity agreement between the parties it was not necessary for Continental to prove fault or a causal connection between the work performed by Amtech and the subsequent leak and explosion in order to establish a duty on the part of Amtech to defend and indemnify Continental. The court awarded *504 Continental the $20,000 it paid in good faith settlement of the claims against it plus approximately $80,000 in costs for defending those claims and $12,000 for attorney fees and costs incurred in prosecuting this action for indemnity.
On appeal, Amtech argues to trigger its duty to indemnify Continental there must have been a "failure of performance in the work" it undertook and this failure of performance must have been a "substantial factor" or "predominating cause" of the loss. Alternatively, it argues Continental was not entitled to attorney fees incurred in prosecuting this action.
For the reasons explained below, we reject both arguments.

DISCUSSION

I. Continental's Losses Are Within the Scope of Indemnity Defined in the Contract.

A. The Standard of Review

(1) The parties agree that where, as here, the trial court construed the indemnity provision at issue without the aid of extrinsic evidence the interpretation of this provision is a question of law subject to our de novo review. (Four Star Electric, Inc. v. F & H Construction (1992) 7 Cal. App.4th 1375, 1380 [10 Cal. Rptr.2d 1].)

B. The Scope of Indemnity Under the Contract

(2) Indemnity agreements are construed under the same rules which govern the interpretation of other contracts. (Myers Building Industries, Ltd. v. Interface Technology, Inc. (1993) 13 Cal. App.4th 949, 969 [17 Cal. Rptr.2d 242].) Accordingly, the contract must be interpreted so as to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) The intention of the parties is to be ascertained from the "clear and explicit" language of the contract. (Civ. Code, §§ 1638-1639.) And, unless given some special meaning by the parties, the words of a contract are to be understood in their "ordinary and popular sense." (Civ. Code, § 1644.)
(3) "In interpreting an express indemnity agreement, the courts look first to the words of the contract to determine the intended scope of the indemnity agreement." (Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co. (1991) 234 Cal. App.3d 1724, 1737 [286 Cal. Rptr. 435].) The indemnity agreement between Continental and Amtech requires Amtech to indemnify *505 Continental for a loss which "arises out of or is in any way connected with the performance of work under this Subcontract."[1] The contract further provides Amtech's liability for indemnity "shall apply to any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of Subcontractor." (Italics added.) Amtech does not deny its installation of the valve in the refrigeration plant was "an act" carried out in "the performance of work under [the] Subcontract." Nor does it deny the loss suffered by Continental was "in any way connected" with that act. Therefore, under the contract as written, Continental is entitled to indemnity from Amtech for its losses.
There is no merit to Amtech's contention every cause of action for indemnity requires a showing of fault on the part of the indemnitor. On the contrary, courts will enforce indemnity agreements even for losses caused by acts over which the indemnitor had no control. (See Vinnell Co. v. Pacific Elec. Ry. Co. (1959) 52 Cal.2d 411, 416 [340 P.2d 604].) To the extent the case relied on by Amtech, Gouvis Engineering v. Superior Court (1995) 37 Cal. App.4th 642, 647-648 [43 Cal. Rptr.2d 785], suggests fault is an element of every cause of action for indemnity, the statement is pure dictum and taken out of context. In the present case, Continental's entitlement to indemnity does not depend on a showing Amtech was at fault in performing its work on the refrigeration system. Rather, Amtech's duty to indemnify Continental applies "to any acts or omissions ... on the part of [Amtech]" not just to its "willful misconduct or negligent conduct." The language of the agreement leaves no doubt the parties intended Amtech should indemnify Continental irrespective of whether Continental's loss arose by reason of Amtech's negligence or for any other reason except for the sole negligence or willful misconduct of Continental. (See Civ. Code, § 2782.)
Nor has Amtech convinced us we should construe the indemnity agreement to require proof Amtech's performance was a "substantial factor" or "predominating cause" of Continental's loss in contravention of the agreement's express language providing indemnity for loss which "arises out of or is in any way connected" with Amtech's performance.
Amtech maintains limiting its liability for indemnity to cases in which its performance was a "substantial factor" or "predominating cause" in the loss is necessary to conform the agreement to the parties' reasonable expectations *506 and to avoid an unfair result. We disagree. We find the risk allocation in the subject agreement is neither unreasonable nor unconscionable.[2]
The parties to an indemnity contract enjoy "great freedom of action" in allocating risk, subject to certain limitations of public policy. (E.L. White, Inc. v. City of Huntington Beach (1978) 21 Cal.3d 497, 507 [146 Cal. Rptr. 614, 579 P.2d 505].) We find the risk allocation in the Continental-Amtech agreement is commercially reasonable given that between Amtech and Continental, the former was in the better position to protect against loss arising out of its performance of its contract. This is illustrated by the fact it was Amtech, not Continental, which selected and installed the particular valve which subsequently failed leading to the explosion. Moreover, the language of the agreement at issue  "arising out of or in any way connected"  is commonly found in indemnity agreements between contractors and subcontractors.[3]
*507 Contrary to Amtech's contention, the causal connection defined in the agreement does not impose virtually unlimited liability on Amtech. Amtech's liability must be connected to an "act" or "omission" in the performance of its subcontract, not merely to the performance itself. Therefore, the fact Amtech installed the refrigeration system in the plant would not make it liable for indemnity for the loss incurred in paying damages to someone who suffered food poisoning from eating an Oscar Meyer hot dog on the theory that but for the refrigeration system Oscar Meyer could not have made the hot dog. The indemnitee in this hypothetical case would have to establish the loss was in some way connected to a specific act or omission of Amtech. Amtech is not liable for any act or omission connected with the performance of work under the subcontract, but only acts or omissions "on the part of [Amtech], its agents, subcontractors or employees." As a further limitation on its liability, Amtech is expressly not required to indemnify Continental for losses arising from the sole negligence or the sole misconduct of Continental, its officers, agents, servants, or independent contractors.
Furthermore, we are dealing here with two large, sophisticated construction enterprises which could be expected to review, understand and bargain over their indemnity agreement. The record shows the parties did in fact negotiate a number of substantive modifications to the contract originally offered by Continental. Thus, unless public policy requires a different result, "[w]hen the parties knowingly bargain for the protection at issue, the protection should be afforded." (Rossmoor Sanitation, Inc. v. Pylon, Inc. (1975) 13 Cal.3d 622, 633 [119 Cal. Rptr. 449, 532 P.2d 97].)
We find nothing unconscionable about the risk allocation in the agreement. This is not a case of a small-time subcontractor being saddled with ruinous liability for the mere privilege of installing a valve in a meat packing plant.[4] As we noted above, Amtech is a large, sophisticated company which had the opportunity to, and did in fact, negotiate the terms of its subcontract with Continental. Moreover, Amtech was paid $1.2 million for its work in remodeling the refrigeration plant.
For the reasons stated above, we conclude the trial court properly awarded Continental indemnity for its losses in the good faith settlement of the claims against it and the costs incurred in defending those claims.

*508 II. The Trial Court Properly Awarded Continental Attorney Fees Incurred in This Action to Enforce the Indemnity Agreement.

(4) Amtech argues even if Continental is entitled to indemnity for its losses, including attorney fees, in defending and settling the claims against it, Continental is not entitled to attorney fees incurred in prosecuting this action. Again, we disagree.
To state the obvious: Whether Continental is entitled to recover attorney fees incurred in enforcing the indemnity agreement, as opposed to recovering attorney fees incurred in defending the underlying claims, depends on the language of the contract.
In the cases cited by Amtech, the contract provisions pertaining to attorney fees were limited to attorney fees incurred in defending against the underlying claims. For example, in Hillman v. Leland E. Burns, Inc. (1989) 209 Cal. App.3d 860, 865 [257 Cal. Rptr. 535] the contract provided only that the indemnitor would indemnify "`against all claims, damages, losses and expenses including attorneys' fees arising out of or resulting from the performance of the Work.'" (See also Otis Elevator Co. v. Toda Construction, supra, 27 Cal. App.4th at p. 564; Myers Building Industries, Ltd. v. Interface Technology, Inc., supra, 13 Cal. App.4th at pp. 973-974; Meininger v. Larwin-Northern California, Inc. (1976) 63 Cal. App.3d 82, 84 [135 Cal. Rptr. 1]; County of San Joaquin v. Stockton Swim Club (1974) 42 Cal. App.3d 968, 971 [117 Cal. Rptr. 300].)
In contrast, the contract before us expressly provides for attorney fees incurred as the result of any breach of the contract.
Section 11 of the contract provides: "The Subcontractor specifically obligates itself to the Contractor in the following respects ...:" There follow seven subparagraphs defining the subcontractor's obligations. Subparagraph (b) contains the indemnity provision which we have discussed above. Included in that indemnity provision is the obligation to indemnify Continental from all loss, damage, etc., "including attorney's fees" which "arises out of or is in any way connected with the performance of work under this Subcontract." If this was the extent of the contract's provision for attorney fees, we would agree with Amtech that Continental is not entitled to attorney fees incurred in prosecuting this action for breach of the indemnity agreement. There is, however, an additional provision on attorney fees.
Following the last subparagraph, section 11 goes on to state: "And the Subcontractor shall indemnify the Contractor, and save it harmless from any *509 and all loss, damage, costs, expenses and attorney's fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract." (Italics added.) It is clear this concluding paragraph is not referring to indemnity for attorney fees incurred in defending actions brought against Continental. That indemnity is covered in subparagraph (b) of the section. Rather, the quoted language is intended to entitle Continental to attorney fees in any action it brings against Amtech for breach of any provision of the contract including, but not limited to, breach of the indemnity provisions of subparagraph (b).
Therefore, the trial court properly awarded Continental attorney fees incurred in prosecuting this action.

DISPOSITION
The judgment is affirmed.
Lillie, P.J., and Woods, J., concurred.
A petition for a rehearing was denied March 13, 1997, and appellant's petition for review by the Supreme Court was denied May 14, 1997.
NOTES
[1] Contrary to the trial court's conclusion, this provision does require proof of causation. See discussion below at pages 505-507.
[2] In Rowe v. Farmers Ins. Exchange (1992) 7 Cal. App.4th 964, 972 [9 Cal. Rptr.2d 314], a case involving insurance coverage for injuries "arising out of" the use of an uninsured motor vehicle we held "the use of the automobile must be a substantial factor or predominating cause of the injury." We based our holding on the fact the automobile is such a ubiquitous part of life there are few activities in which the use of an automobile does not play a part somewhere in the chain of events. Without this restrictive interpretation of the causation requirement, automobile liability policies would be converted into general liability insurance contracts, a result clearly not contemplated by the insurer and policy holder. (Id. at pp. 970, 972.) As we explain below, Rowe is inapplicable here because there is no need to depart from the plain meaning of the words in the indemnity agreement before us in order to conform the agreement to the parties' reasonable expectations. (See discussion, post, at pp. 506-507.)

Amtech cites Indenco, Inc. v. Evans (1962) 201 Cal. App.2d 369, 372 [20 Cal. Rptr. 90] for the proposition indemnity for loss "`that may arise or be occasioned in any way'" by performance of a construction contract requires a showing the loss was directly connected to the work. This was not Indenco's holding. The court merely observed the loss for which the plaintiff sought indemnity "resulted from conduct directly related to the work of Evans." (Id. at p. 376.) The court did not say the loss had to be directly related to Evan's work in order to trigger the indemnity clause. Causation was not in issue.
[3] Although indemnity agreements commonly contain language providing for indemnification in cases of loss "`arising out of or in any way connected with'" the performance of a contract (see, e.g., Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co. (1968) 69 Cal.2d 33, 36 [69 Cal. Rptr. 561, 442 P.2d 641]; Otis Elevator Co. v. Toda Construction (1994) 27 Cal. App.4th 559, 561, fn.1 [32 Cal. Rptr.2d 404]; Appalachian Ins. Co. v. McDonnell Douglas Corp. (1989) 214 Cal. App.3d 1, 43 [262 Cal. Rptr. 716]; John E. Branagh & Sons v. Witcosky (1966) 242 Cal. App.2d 835, 836, fn.2 [51 Cal. Rptr. 844]) few courts have discussed the scope of indemnity under this language and those which have usually have done so in the context of whether the language expresses an intent to indemnify the indemnitee for its own negligence (see, e.g., Graver Tank & Manufacturing Co. v. Fluor Corp., Ltd. (1967) 4 Ariz. App. 476 [421 P.2d 909, 910]; Robert & Company Assoc. v. Pinkerton & Laws Co. (1969) 120 Ga. App. 29 [169 S.E.2d 360, 363].) We have found only two cases which address the meaning of "arising out of performance of work," or its equivalent, in terms of causation. In Perkins v. Rubicon, Inc. (La. 1990) 563 So.2d 258, 259, the court read this language "as requiring a connexity similar to that required for determining cause in fact." The court in Commander v. BASF Wayondotte Corp. (5th Cir.1992) 978 F.2d 924, 927, relying on Perkins, held the term "`occur[] directly or indirectly as the result of the Contractor's prosecution of the work.' ... requires only a presence test, a `but for' causation test, like the provision in Perkins."
[4] Cf. Jones v. Strom Construction Co., Inc. (1974) 84 Wn.2d 518 [527 P.2d 1115, 1118] in which the court held it would be unreasonable to construe an indemnity agreement to require the subcontractor to indemnify the contractor for its own sole negligence when, among other things, the subcontract involved only approximately one-twentieth of the overall contract price for the project.